

**SIGNED this 12th day of January, 2017**

_Shelley D. Rucker_
_____
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT FOR
## THE EASTERN DISTRICT OF TENNESSEE

In re:

**Stephanie Anne Roller Morrow,**                                **No. 4:15-bk-13391-SDR**
                                                                  **Chapter 7**

                    **Debtor**
_____

**Contemporary Imports, Inc.,**
**d/b/a Contemporary Mitsubishi,**

                    **Plaintiff**

            **v.**                                                **Adv. No. 4:15-ap-1128-SDR**

**Stephanie Anne Roller Morrow**
**a/k/a Stephanie Anne Roller**
**a/k/a Stephanie Anne Morrow**
**a/k/a Roller Automotive, LLC,**

                    **Defendant**

1

## <u>MEMORANDUM OPINION</u>

Contemporary Imports, Inc., d/b/a Contemporary Mitsubishi ("Contemporary" or "Plantiff") seeks a judgment against Stephanie Anne Roller ("Defendant" or "Debtor"), for $16,425 along with prejudgment interest at the rate of 7%. It also seeks a determination that the debt is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), (4), and (6).

Contemporary's claim arises from the failure of the Defendant to remit the proceeds from the sale of a Jeep that was purchased by Contemporary, titled in Contemporary's name, and left in the possession of the Defendant's company, Roller Automotive, LLC, for repairs and resale. The Defendant blames her inability to remit those proceeds to Contemporary on theft and mismanagement by her former business partner and spouse, Chance Morrow. Unfortunately for the Defendant, the court finds that her former husband's alleged misconduct, which was discovered after the sale of the vehicle and conversion of the proceeds, does not absolve her of the nondishcargeable liability caused by her intentional acts in disregard of Contemporary's legal rights. The court finds that Contemporary holds a claim for the value of the missing vehicle plus prejudgment interest of 7% and that its claim is not dischargeable.

These are the court's findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure 7052.

2

## I.    Jurisdiction

The court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I).   These are

core matters regarding the dischargeability of a debt owed to the Plaintiff. The parties have also

consented to this court entering a final order. (Doc. No. 17, Scheduling Order).

## II.    Facts

*The Parties*

The Debtor filed a Chapter 7 voluntary bankruptcy petition on August 6, 2015. (Bankr.

Case No. 4:15-bk-13391-SDR, Doc. No. 1). Contemporary filed this adversary proceeding on

November 19, 2015. (Doc. No. 1, Complaint).[3] A trial was held on September 19, 2016.

At trial, the court first heard testimony from Torrey Cochran, the owner of Contemporary.

(Testimony of Torrey Cochran, Sept. 19, 2016, at 11:24:10 – 12:01:54). Mr. Cochran testified

that both Ms. Roller and Mr. Morrow had been authorized to act on behalf of Contemporary as

"authorized agents" at auto auctions. (*Id.* at 11:29:14). Mr. Cochran's understanding was that Ms.

Roller was the owner of Roller Automotive and that her then husband, Mr. Morrow, was

employed by her. (*Id.* at 11:29:29). Prior to authorizing Ms. Roller as Contemporary's agent, Mr.

Cochran performed a background investigation on her, through which he learned that she had

prior experience in the auto auction industry and heard otherwise good reports about her. (*Id.* at

---

[3] All docket entry citations refer to Adversary Proceeding No. 4:15-ap-01128-SDR unless
otherwise noted.

11:28:02, 11:29:44, 11:59:13). Mr. Cochran explained that he knew Mr. Morrow previous to their business relationship. (*Id.* at 11:46:42).

Mr. Cochran stated that Ms. Roller was "actively involved" in the business of Roller Automotive and that she was "the principal and one of our main contacts." (*Id.* at 11:36:05). He testified that Ms. Roller dealt with Contemporary "on a regular basis" and that he had "several conversations" with her while she was engaged buying cars for Contemporary. (*Id.* at 11:36:15, 11:45:44). He admitted that he had never met Ms. Roller in person, but he also explained that he never saw Mr. Morrow in person after their business relationship began. (*Id.* at 11:46:23). Mr. Cochran acknowledged that he had more numerous conversations about the business with Mr. Morrow than with Ms. Roller. (*Id.* at 11:47:19).

Next, the court heard testimony from the Defendant. (Testimony of Stephanie Roller, Sept. 19, 2016, at 12:02:14 - 12:43:25). Ms. Roller acknowledged that she was the sole owner of Roller Automotive but explained that the business was formed under her name because Mr. Morrow owed federal taxes. (*Id.* at 12:03:28). She testified that the business was started "at the end of 2010" under the name Morrow Automotive. (*Id.* at 12:16:31). She explained that Mr. Morrow had told her at the time that the business should be in her name for "minority purposes," because "not many women . . . own car dealerships." (*Id.* at 12:03:48). Ms. Roller testified that she had previously worked in the auto auction business as a "sales girl" but that she had not worked in the "auto business" until she met Mr. Morrow. (*Id.* at 12:04:04). She had never formed a company before. (*Id.* at 12:04:11). She described her role at Roller Automotive as a "secretary

and driver." (*Id.* at 12:06:02). She explained that she was "loosely" involved with Roller

Automotive the entire three years it was in business. (*Id.* at 12:38:04).

Ms. Roller testified that Mr. Morrow had twenty years of experience in the auto auction

business. (*Id.* at 12:04:41). She stated that Mr. Morrow conducted all operations for Roller

Automotive and that "he bought every car and sold every car himself, every single one." (*Id.* at

12:05:00, 12:05:45). She testified that Roller Automotive had a retail lot from which it sold some

vehicles, including other vehicles purchased by Contemporary per the parties' agreement. (*Id.* at

12:17:06, 12:27:36). Despite Ms. Roller's disavowal of any real involvement in the business, she

did sign bills of sale, was a signatory on the company's bank account, and made deposits and

signed checks. (*Id.* at 12:06:34, 12:18:42, 12:22:28, 12:23:53). Despite her claims of

inexperience, she demonstrated a detailed knowledge of the business and what was involved in

transferring title to the vehicles.

Ms. Roller testified that before Roller Automotive was formed, she had not had any

relationship with Mr. Cochran and had in fact never met him face-to-face before trial. (*Id.* at

12:05:28). She stated that Mr. Morrow had known Mr. Cochran for several years. (*Id.* at

12:05:42). She explained that Mr. Morrow would not let her talk to Mr. Cochran and said that

she only talked to Mr. Cochran on the occasions that Mr. Morrow would not answer his phone.

(*Id.* at 12:31:44).

*The Business Arrangement*

Mr. Cochran testified that after making Ms. Roller and Mr. Morrow authorized agents of

Contemporary, he entered into an agreement with them whereby they would attend auto auctions

5

on behalf of Contemporary. (Testimony of Torrey Cochran, Sept. 19, 2016, at 11:30:12). Under the agreement, Ms. Roller and Mr. Morrow were each, independent of one another, authorized to buy automobiles under Contemporary's name at auction, make repairs to them if necessary, and then resell the automobiles at a second auction. (*Id.* at 11:30:39). Contemporary would pay the auction company for the vehicles, obtain financing and insurance, and handle all paper transactions to and from the auctions. (*Id.* at 11:31:30). The vehicles were bought in Contemporary's name, and Contemporary would send checks for payment directly to the auction in return for the auction sending titles directly to Contemporary. (*Id.* at 11:32:25). Roller Automotive was responsible for getting the purchased automobiles to its lot in McMinnville, Tennessee, performing any necessary repairs, returning the automobiles to the auction, and then selling them. (*Id.* at 11:32:48). After the automobiles were sold at the second auction, Contemporary would send the titles to the auction company, and the auction company would send a check to Contemporary. (*Id.* at 11:33:15).

Mr. Cochran testified that Contemporary would reconcile its accounts of units bought and sold on a monthly basis and split the profits with Roller Automotive. (*Id.* at 11:33:24). The profits were calculated after Roller Automotive was paid for the cost of the repairs. (Testimony of Stephanie Roller, Sept. 19, 2016, at 12:22:11). In addition, in exchange for financing the purchase of the vehicles, Roller Automotive agreed to pay 7% per annum on the cost of any unit purchased for the period from the purchase at auction until its resale. (Testimony of Torrey Cochran, Sept. 19, 2016, at 12:00:26) The parties would net out the amounts owed to one another and Contemporary would send payment to Roller Automotive for its share. (*Id.* at 11:33:24).

6

Copies of checks reflecting payments to Roller Automotive from Contemporary for the period

the business arrangement continued were admitted as Exhibit 1. (Tr. Ex. No. 1). The checks

show monthly payments of varying amounts for the period beginning in June through October of

2012. (*Id.*). Following a five month gap, a final check in the amount of $18,819.19 was issued by

Contemporary to Roller Automotive on April 19, 2013. (*Id.*).

There is little disagreement about the terms of the arrangement based on Ms. Roller's and

Mr. Cochran's testimony, although no written agreement was entered as evidence. In her

testimony, Ms. Roller acknowledged the basic arrangement between Roller Automotive and

Contemporary as described by Mr. Cochran. (Testimony of Stephanie Roller, Sept. 19, 2016, at

12:21:36). Ms. Roller testified that the deal between Contemporary and Roller Automotive was

made by Mr. Morrow "a hundred percent." (*Id.* at 12:13:59). She acknowledged that she was an

authorized agent for Contemporary but explained that it was so that checks could be written to

her instead of Mr. Morrow because of his IRS debt. (*Id.* at 12:14:05). She stated that she "never

ever bought a car for [Mr. Cochran] or sold one for him ever. [Mr. Morrow's] name are [*sic*] on

all of those bill of sales, every single one of them, including the one for the Jeep." (*Id.* at

12:14:11). The court does not find this testimony credible. As set out below, Ms. Roller was

involved in the business operations of Roller Automotive, and, in particular, signed the bill of

sale for the Jeep in question when it was resold to a third party in April of 2013.

*The Business Break Up and Sale of the Jeep*

Mr. Cochran testified that the arrangement was not "going as smoothly as . . . [he] felt

like it should," and he decided to end the business relationship. (Testimony of Torrey Cochran,

Sept. 19, 2016, at 11:36:46). He proposed that the parties "sever the relationship," that Roller Automotive sell the vehicles that it had in stock, and "get everything squared away financially." (*Id*.). He testified that when he asked Roller Automotive to sell its remaining inventory in order to unwind the business relationship and settle accounts he believed that Roller Automotive still had in its inventory a 2009 Jeep Wrangler, VIN No. 1J4GA64199L55526, that Contemporary had purchased at auction. (*Id*. at 11:37:43). Mr. Cochran testified that he later learned that "they" had already sold the Jeep at this time. (*Id*. at 11:38:30).

The title to the Jeep was admitted as Exhibit 2, and it shows that Contemporary purchased the Jeep on November 28, 2012. (Tr. Ex. No. 2). Mr. Cochran testified that the purchase price was $16,425 and that Contemporary still had possession of the Jeep's original title. (Testimony of Torrey Cochran, Sept. 19, 2016, at 11:40:00, 12:00:08). He stated that he first learned that the Jeep had been sold when a banker contacted him about releasing the title on behalf of Micah Lorrance, who had purchased the vehicle. (*Id*. at 11:40:11, 11:41:51).

Ms. Roller testified that she was previously in a romantic relationship with Mr. Lorrance. (Testimony of Stephanie Roller, Sept. 19, 2016, at 12:22:52). She said that Mr. Lorrance called her about wanting to purchase a vehicle, at which point she handed the telephone to Mr. Morrow and the two men spoke about the Jeep. (*Id*. at 12:23:03). On April 6, 2013, Mr. Lorrance bought the Jeep from Roller Automotive. The bill of sale was admitted as Exhibit 3. (Tr. Ex. No. 3). Mr. Lorrance paid $22,344 less a trade-in allowance of $5,000, with a net due including sales tax of $18,900. (*Id*.). The bill of sale reflects that he traded in a 2008 Nissan Altima. (*Id*.).

8

Ms. Roller acknowledged that she signed the bill of sale for Roller Automotive but explained that she was a "glorified secretary" and "signed everything." (Testimony of Stephanie Roller, Sept. 19, 2016, at 12:23:47, 12:24:35). She testified that she signed the bill of exchange at the instruction of Mr. Morrow. (*Id.* at 12:38:39). Ms. Roller admitted that, at the time she signed the bill of sale, she knew how the Jeep had been acquired, that Contemporary had paid for it, and that Contemporary held title to the Jeep. (*Id.* at 12:25:02, 12:25:29). She said that she did not tell Mr. Lorrance that Roller Automotive did not have title to the Jeep, but she explained that it was "typical in the car business to sell a car and not have the title." (Testimony of Stephanie Roller, Sept. 19, 2016, at 12:26:07) She also confidently testified that the seller of a vehicle has thirty days in which to deliver title to the purchaser. *Id.* She did not explain why she failed to follow up with Mr. Cochran to tell him about the sale and that she needed the title within that 30-day period.

Ms. Roller testified that approximately a year after buying the Jeep, Mr. Lorrance called her and told her that he did not yet have the title. (*Id.* at 12:30:24). She contended at trial that the bank should have checked on the title within thirty days of the sale and that it "fell through the cracks at the bank." (*Id.* at 12:30:57). Ms. Roller's response to questioning about the title is telling. Rather than being concerned that she falsely represented that her company owned the vehicle, she was critical of the bank for loaning the money without the title.

Ms. Roller testified that when she signed the bill of sale, she had no intent of cheating Contemporary out of its money and that she anticipated that Contemporary would continue to be paid as per the parties' agreement. (*Id.* at 12:39:15). The court does not find this testimony

9

credible. The court finds that Ms. Roller knew the business arrangement with Contemporary was

over. Ms. Roller testified that Exhibit 1 represented the last check received by Roller Automotive

from Contemporary settling their accounts. (*Id.* at 12:39:46). This check is dated April 19, 2013,

which is after the date of the bill of sale to Mr. Lorrance. (Tr. Ex. Nos. 1, 3). Ms. Roller stated

that she and Mr. Morrow continued to work as agents for Contemporary after they received this

final check (Testimony of Stephanie Roller, Sept. 19, 2016, at 12:41:27), but there is no evidence

of any later transactions between Contemporary and Roller Automotive. The payment of the last

check followed a gap in the payments and a heated argument between Mr. Morrow and Mr.

Cochran regarding amounts owed by Contemporary to Roller Automotive. Ms. Roller stated that

she did not participate in the "heated conversations" between Mr. Morrow and Mr. Cochran

regarding the end of the business relationship. (*Id.* at 12:43:00). She testified that Contemporary

sent a final "wash sheet" showing the settlement of accounts but that she could not find it. (*Id.* at

12:42:23). The court concludes that she was aware that the relationship was ending and that there

were problems collecting from Mr. Cochran and Contemporary when the Jeep was sold in April.

*The Cover Up*

Mr. Cochran testified that when he ended Contemporary's business relationship with

Roller Automotive, he had a conversation with Ms. Roller and Mr. Morrow about money that

they owed Contemporary. (Testimony of Torrey Cochran, Sept. 19, 2016, at 11:54:38). The date

of this conversation is unclear from the testimony, but Mr. Cochran clarified for the court that he

felt the money they owed was solely related to the Jeep and did not involve any other vehicles.

(*Id.* at 11:54:50). Mr. Cochran testified that at some point Ms. Roller and Mr. Morrow told him

10

that "they would like to come get the title for the Jeep." (*Id.* at 11:43:10). Mr. Cochran testified

that, when he explained that he would only give them the title to the Jeep in exchange for a

cashier's check for the purchase price of the vehicle, they "seemed to be offended that [he would]

require a cashier's check from them" and did not deliver a check. (*Id.* at 11:43:57). Although the

date of this conversation is unclear, the court infers that it occurred after Roller Automotive had

sold the Jeep to Mr. Lorrance but before Mr. Cochran was aware that it had been sold.

Mr. Cochran also testified that, at an even later date, after he had sent the settlement

check to Roller Automotive on April 19, 2013, Ms. Roller called and told him that she and Mr.

Morrow had gotten divorced, that she was trying to "square away all of the obligations" of Roller

Automotive, and that she would like to make arrangements to pay him for the Jeep. (*Id.* at

11:42:20). Based on the testimony that the divorce occurred in 2015, the court surmises that this

conversation was months if not years after the Jeep had been sold. Mr. Cochran related that

during this conversation, Ms. Roller did not indicate to him any lack of knowledge about what

had happened to the Jeep. (*Id.* at 11:44:13). Ms. Roller denied demanding release of the title from

Contemporary shortly after the sale, but she did acknowledge asking Mr. Cochran if they "could

work something out." (Testimony of Stephanie Roller, Sept. 19, 2016, at 12:29:35). She said that

this conversation happened "a long time" after selling the Jeep to Mr. Lorrance. (*Id.* at 12:30:02).

*Operations and Misappropriation of Funds from Roller Automotive*

The gist of Ms. Roller's defense is that her failure to remit the proceeds of the Jeep to

Contemporary is the result of Mr. Morrow's misappropriation of funds. Ms. Roller testified that

Roller Automotive had a bank account in its name on which she and Mr. Morrow had signing

11

authority. (*Id.* at 12:06:10). She wrote checks on the account and reconciled it with the help of an

accountant. (*Id.* at 12:18:39, 12:19:09). She stated that Mr. Morrow withdrew money from the

account without her knowledge "all the time" and used funds from the Roller Automotive

account for his personal purposes. (*Id.* at 12:06:53, 12:07:30). She admitted that she indorsed

checks written to Roller Automotive but explained that Mr. Morrow deposited checks for the

company "most of the time." (*Id.* at 12:18:02, 12:22:28). She stated that she never received any

money that was paid from Contemporary to Roller Automotive and that there was no money left

in Roller Automotive's account when Mr. Morrow "left." (*Id.* at 12:12:22). The court does not

find this testimony credible because Ms. Roller also admitted that she and Mr. Morrow used the

company account to pay company and personal bills. (*Id.* at 12:18:45). At one point, Ms. Roller

testified that Mr. Morrow started taking money out of the Roller Automotive account for his

personal use during their last year of marriage, but she later said that he had been "taking money

the whole time. That's just when I started catching it." (*Id.* at 12:19:15, 12:37:19). She said that

she eventually took him off of Roller Automotive's bank account. (*Id.* at 12:20:23). Ms. Roller

testified that she had been divorced from Mr. Morrow since February 2015. (*Id.* at 12:19:59).

    *The Amount of the Debt*

    Mr. Cochran testified that Contemporary paid $16,425 to purchase the Jeep at auction.

(Testimony of Torrey Cochran, Sept. 19, 2016, at 12:00:08). He explained that Contemporary has

continued to pay interest on the balance of its purchase of the Jeep because it had financed the

purchase price. (*Id.* at 12:00:23). He stated that Contemporary's agreement with Roller

Automotive provided for 7% interest to be charged during the period between the time an

automobile was first purchased at auction and the time it was resold at a second auction. (*Id.* at 12:00:49). He said that Contemporary had not been paid any interest for the Jeep. (*Id.* at 12:01:03).

Other than the proceeds of the Jeep, Mr. Cochran admitted that there was a net gain for Contemporary over the period of its relationship with Roller Automotive. (*Id.* at 11:48:51). The only losses he seeks to recover are the purchase price of the Jeep plus the contract interest on that purchase price. Ms. Roller admitted that Roller Automotive never paid for the Jeep, and she did not dispute Mr. Cochran's contention that Roller Automotive owed 7% per annum on the value of any cars in its possession until they were sold. (Testimony of Stephanie Roller, Sept. 19, 2016, at 12:26:55).

### III.    Analysis

Contemporary objects the discharge of its debt for the value of the Jeep on three bases. For the reasons stated below, the court finds that Contemporary has met its burden under 11 U.S.C. §§ 523(a)(4) and (6). Having found the debt to be nondischargeable, the court finds it is unnecessary to address whether the debt should be excepted from discharge as having arisen based on actual fraud.

### 1.    Section 523(a)(4)

Contemporary contends that the Debtor converted the proceeds from the sale of the Jeep for her own use and that she intentionally took for her own benefit property that belonged to Contemporary.

13

11 U.S.C. § 523(a)(4) states in relevant part: "A discharge under section 727 . . . of this

title does not discharge an individual debtor from any debt . . . (4) for fraud or defalcation while

acting in a fiduciary capacity, embezzlement, or larceny . . . ." 11 U.S.C. § 523(a)(4). Federal

common law will determine the meaning of the terms in section 523(a)(4). *See SmithKline*

*Beecham Corp. v. Lam (In re Lam)*, 2008 WL 7842072, at *3 (Bankr. N.D. Ga. Mar. 27, 2008)

(citing *Kaye v. Rose (In re Rose)*, 934 F.2d 901 (7th Cir. 1991); *In re Wallace*, 840 F.2d 762

(10th Cir. 1988) (other citations omitted)).

The Sixth Circuit has explained that:

[f]ederal law defines "embezzlement" under section 523(a)(4) as "the fraudulent
appropriation of property by a person to whom such property has been entrusted
or into whose hands it has lawfully come." A creditor proves embezzlement by
showing that he entrusted his property to the debtor, the debtor appropriated the
property for a use other than that for which it was entrusted, and the circumstances
indicate fraud.

*Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996), abrogated on other

grounds as explained in *National Dev. Servs. v. Denbleyker,* 251 B.R. 891 (Bankr. D. Colo.

2000) (quoting *Gribble v. Carlton (In re Carlton)*, 26 B.R. 202, 205 (Bankr. M.D. Tenn. 1982)

and *Moore v. United States*, 160 U.S. 268, 269, 16 S. Ct. 294, 295 (1895) and citing *Ball v.*

*McDowell (In re McDowell)*, 162 B.R. 136, 140 (Bankr. N.D. Ohio 1993)). To demonstrate

embezzlement a creditor must prove all three elements: "(1) 'that he entrusted his property to the

debtor,' (2) that 'the debtor appropriated the property for a use other than that for which it was

entrusted,' and (3) that 'the circumstances indicate fraud.'" *Cash America Fin. Servs., Inc. v. Fox*

*(In re Fox)*, 370 B.R. 104, 115-16 (B.A.P. 6th Cir. 2007) (quoting *In re Brady*, 101 F.3d at 1173).

14

Contemporary has proven that the Jeep was its property. Contemporary paid for the Jeep, and the title to the Jeep is still in Contemporary's name. Ms. Roller does not dispute either of these facts. The parties have little dispute regarding the terms of their business arrangement. Roller Automotive was to repair or refurbish the Jeep as necessary and resell it at auction, after which the proceeds were to be sent to Contemporary. Instead, Roller Automotive represented to a third party buyer that it held the title and then sold the Jeep to this buyer. The Defendant signed the bill of sale showing her company as the seller. Her company took the trade-in vehicle, and she deposited the money into her company's account. When the Defendant received Contemporary's check reconciling what was owed between the parties a few days after the sale, she deposited that check without disclosing that she had sold the Jeep or seeking to reconcile the accounting to reflect the sale. She admits that she and Mr. Morrow used the money in Roller Automotive's account for themselves or their business. They did not disclose the sale to Contemporary until months later. Although the timing of her request to make things right is not clear, it was long after the sale has occurred and her business was winding up following her separation from Mr. Morrow. The court finds that Contemporary has shown that it provided the Jeep to Ms. Roller for a specific purpose and that she appropriated the Jeep for purposes other than that for which it was intended.

With respect to the last element- whether the "circumstances indicate fraud-" the Sixth Circuit has described what type of fraud must be shown:

> The "fraud" required under § 523(a)(4) is "fraud in fact, involving moral turpitude or *intentional* wrong." Accordingly, embezzlement claims under § 523(a)(4) require "proof of the debtor's fraudulent intent in taking the [creditor's]

15

property." As the *Brady* definition suggests, the debtor's fraudulent intent may
often be shown by circumstantial evidence.

*In re Fox*, 370 B.R. at 116 (internal quotations and citations omitted).

Like fraud and misrepresentation under 523(a)(2), this claim requires a showing of
specific intent to permanently deprive a party of his or her property. "[M]ere conversion does not
rise to the level of embezzlement or larceny under 523(a)(4)." *In re Cross*, No. 08-50531, 2009
WL 981900 at *4 (Bankr. E.D. Tenn. Apr. 13, 2009) (citing *In re Wilson*, 114 B.R. 249, 252
(Bankr. E.D. Cal. 1990)).   In *In re Wilson,* the court held the debt to be dischargeable because
the plaintiff failed to provide the court with "any significant evidence (direct or circumstantial)
regarding the [d]ebtor's actual state of mind at the time the monies were so converted." *Wilson*,
114 B.R. at 252.   Circumstantial evidence of fraud is sufficient, but the court must have some
evidence of the deceit or scheme to find fraudulent intent. *In re Fox*, 370 B.R. at 116-117.
Badges of fraud from which intent may be inferred include:

> (1) the suspicious timing and chronology of events; (2) a debtor's lack of financial
> health at the time of the transaction (e.g., insolvency); (3) the failure to keep
> adequate records; and (4) the existence of unusual transfers. In utilizing such
> indicia, however, the Sixth Circuit has cautioned against "factor-counting,"
> instead holding, "[w]hat courts need to do is determine whether all the evidence
> leads to the conclusion that it is more probable than not that the debtor had the
> requisite fraudulent intent."

*In re Marroquin*, 441 B.R. 586, 593–94 (Bankr. N.D. Ohio 2010) (internal quotations and
citations omitted).

The court finds that the evidence at trial demonstrated that Ms. Roller had such fraudulent
intent. The evidence showed that the parties were winding up their business arrangement. Mr.
Cochran was concerned that the relationship had not been going as smoothly as he had hoped,

16

and Ms. Roller testified that her former husband was upset that they were not being paid. The checks from Contemporary to Roller Automotive showed a gap of several months before the final settlement check arrived. The sale of the Jeep to Mr. Lorrance occurred just before the final settlement check arrived. Ms. Roller's use of her company's name on the bill of sale, her execution of the bill of sale, the deposit of the funds into her company's account, and her use of funds in that account followed by a year of silence about what happened to the Jeep are all circumstances from which the court may infer that at the time she sold the Jeep as her own property she did not intend to pay Mr. Cochran for the vehicle. The court's conclusion is buttressed by the fact that in Ms. Roller's later discussion with Mr. Cochran about buying the Jeep from him she did not mention that she had already sold it. This is evidence of an attempt to conceal her act.

Ms. Roller contends that she was just a glorified secretary who merely did as she was told by her former husband, Mr. Morrow. The court finds her contentions that Mr. Morrow contributed to her company's demise credible. However, the court nevertheless finds that Ms. Roller was very knowledgeable about the operations of her business, including the use of its checking account, the arrangement with Contemporary, the purchase and sale of this particular Jeep, and her obligations to deliver title to the buyer and the proceeds from the sale to Contemporary. She signed the bill of sale. The fact that she may have also been defrauded at a later date or be a victim of embezzlement herself does not excuse her conduct. In light of the length of time between the sale and her attempt to remedy the problem, her current plea that she tried to make it right does little to mitigate her fraudulent intent in 2013. The court finds that

17

Contemporary has shown that the circumstances indicate fraudulent intent. Accordingly, the

court finds that Contemporary has proven the elements for excepting its claim from discharge

under section 523(a)(4).

    **2.**    **Section 523(a)(6)**

    The Plaintiff claims that the Defendant willfully and maliciously converted the proceeds

from the sale of the Jeep. 11 U.S.C. § 523(a)(6) states in relevant part:

> A discharge under section 727 . . . of this title does not discharge an individual
> debtor from any debt – . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the
> property of another entity[.]

11 U.S.C. § 523(a)(6).

    Whether a debt is dischargeable pursuant to 11 U.S.C. § 523(a)(6) is determined by

analyzing federal law. *See e.g., J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 800-01

(Bankr. N.D. Ohio 2001) (citing *Call Fed. Credit Union v. Sweeney (In re Sweeney)*, 264 B.R.

866, 870 (Bankr. W.D. Ky. 2001); *Hinze v. Robinson (In re Robinson)*, 242 B.R. 380, 388

(Bankr. N.D. Ohio 1999)). 11 U.S.C. § 523(a)(6) provides that a debt that is *both* willful *and*

malicious is nondischargeable. *See* 11 U.S.C. § 523(a)(6). "[T]he judgment must be for an injury

that is both willful and malicious. The absence of one creates a dischargeable debt." *Markowitz v.*

*Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999). The U.S. Supreme Court has

addressed the meaning of "willful" within the context of § 523(a)(6). *Kawaauhau v. Geiger*, 523

U.S. 57, 118 S. Ct. 974 (1998). "The word 'willful' in (a)(6) modifies the word 'injury,'

indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate

18

or intentional *act* that leads to injury." *Id.* at 61, 977 (emphasis in original). The Supreme Court

referred to two prior decisions in which it discussed conversion, one of which found the debt to

be dischargeable and the other which did not. *Id.* at 62, 978. In *McIntyre v. Kavanaugh*, 242 U.S.

138, 37 S. Ct. 38 (1916) the court found that a creditor's debt was excluded from discharge based

on the acts of a broker which deprived a creditor "of his property forever by deliberately

disposing of it without semblance of authority." *Id.* at 141, 39. The court then compared those

circumstances with those in *Davis v. Aetnea Acceptance Co.*, 293 U.S. 328, 55 S. Ct. 151 (1934).

In *Davis*, the court found that the conversion was not willful and malicious and therefore found

that the debt was discharged. Specifically, the court noted that the unauthorized sale was reported

to an officer of the creditor on the day the sale was made and the similar sales had occurred on

"many other occasions" without express consent and "the proceeds accounted for thereafter." *Id.*

at 330, 152.

The Sixth Circuit has more recently described the holding in *Geiger* as follows:

> The Court held that "willful" means "voluntary," "intentional," or
> "deliberate." As such, only acts done with the intent to cause injury – and not
> merely acts done intentionally – can cause willful and malicious injury. The Court
> explained its holding by discussing the importance of context:

>> The word "willful" in (a)(6) modifies the word "injury," indicating that
>> nondischargeability takes a deliberate or intentional *injury*, not merely a
>> deliberate or intentional act that leads to injury. Had Congress meant to
>> exempt debts resulting from unintentionally inflicted injuries, it might
>> have described instead "willful acts that cause injury." Or, Congress might
>> have selected an additional word or words, i.e., "reckless" or "negligent,"
>> to modify "injury." Moreover, as the Eighth Circuit observed, the (a)(6)
>> formulation triggers in the lawyer's mind the category "intentional torts,"
>> as distinguished from negligent or reckless torts. Intentional torts generally

19

> require that the actor intend "the *consequences* of an act," not simply "the
> act itself."

*In re Markowitz*, 190 F.3d at 464 (quoting *Geiger*, 523 U.S. at 61-62, 118 S. Ct. at 977).

Following the lead of the Supreme Court in *Geiger*, the Sixth Circuit held that "unless
'the actor desires to cause consequences of his act, or . . . believes that the consequences are
substantially certain to result from it,' he has not committed a 'willful and malicious injury' as
defined under § 523(a)(6)." *In re Markowitz*, 190 F.3d at 464.

In analyzing the Plaintiff's claim under § 523(a)(6), the questions for the court include:
whether, at the time Ms. Roller signed the bill of sale to Mr. Lorrance, she intended to deprive
Contemporary of its interest in the Jeep; and whether, at the time she deposited the proceeds into
her company's account and spent them, she knew that her conduct would cause injury. If she did
not specifically intend to deprive Contemporary of the proceeds, the court may also consider
whether she believed that her conversion of the funds was substantially certain to result in
Contemporary not being paid for the Jeep.

In answering these questions, the distinctions noted between the unauthorized sale of
collateral in *Geiger* and other cases analyzing the nondischargeability of claims arising from the
unauthorized sale of a secured creditor's collateral are helpful. In the case of *In re Jones*, the
bankruptcy court held that the willfulness requirement of section 523(a)(6) "may be indirectly
established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the
creditor's lien rights; and (2) the debtor knew that his conduct would cause injury to those
rights." *In re Jones*, 276 B.R.797, 802 (Bankr. N. D. Ohio 2001). Here, the Plaintiff has shown

20

both. Ms. Roller knew she would have to deliver the Jeep or its proceeds to Contemporary under their agreement. She knew that neither she nor her company had paid for the Jeep. She knew her company was having difficulty getting paid by Contemporary and had not received a check in several months. She signed the bill of sale and did not make any adjustment to the settlement accounting when the last check arrived a few days later. She and Mr. Morrow used the proceeds and then waited months to disclose the sale to Contemporary. In fact, they never disclosed the sale to Contemporary. It was Mr. Lorrance's lender who informed Mr. Cochran that the Jeep had been sold.

The court also finds the conversion to have been a malicious act. A malicious injury occurs "when a person acts in conscious disregard of [her] duties or without just cause or excuse." *Id.* at 803 (citing *Gonzalez v. Moffitt (In re Moffitt),* 254 B.R. 389, 396 (Bankr. N.D. Ohio 2000)). A finding of maliciousness does not require a determination of ill will or specific intent. *See Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 308 (B.A.P. 6th Cir. 2004). In addition, "malice does not require any ill will or specific intent to do harm, only to do an act without just cause or excuse, but that is beyond negligence or recklessness." *West Mich. Cmty. Bank v. Wierenga (In re Wierenga)*, 431 B.R. 180, 185 (Bankr. W.D. Mich. 2010). The court finds that Ms. Roller knew what her duties were when she sold the Jeep. When the settlement check from Contemporary arrived only a few days after the sale, she knew that the amount should have been offset by the proceeds she had already received per the parties' arrangement; yet, she failed to disclose the sale.

21

In her testimony, Ms. Roller offered little justification for her actions. She testified that she thought there would be more checks coming from which she could settle up with Contemporary. The only testimony in support of her contention that more checks would be coming was her testimony that she and her husband continued to act as agents for Contemporary. The court does not find this testimony credible. She admitted that she did not receive anything else from Contemporary after the April 2013 check, and that Contemporary did not owe her anything when she filed her case. The court does not believe that would be the case had the business arrangement continued. The exact timing of the termination of the business arrangement is confusing based on the parties' testimony, but the court relies on the debtor's testimony that she was aware of heated arguments between Mr. Cochran and Mr. Morrow over nonpayment, which correlates to the gap in payments between October 2012 and April 2013. The court also relies on Ms. Roller's admission that she did not disclose the sale of the Jeep for several months after it must have become apparent that the arrangement had concluded as further evidence that her use of the funds was not justified. Her last attempt at an excuse for her conversion was that the misappropriation was Mr. Morrow's fault. However, her explanation of his theft from the company's account leads the court to believe that, at the time the funds were used, the parties both had access to the account and were both aware of its use. The court notes that there was no testimony from Ms. Roller about disputes with Mr. Morrow regarding the use of proceeds while the funds were being spent. Ms. Roller's testimony was that she discovered the alleged theft in the last year of their marriage, 2014.

The court finds that Contemporary has shown that the sale of the Jeep and conversion of its proceeds was not an accident. The Defendant made the sale out of the ordinary course of the parties' business arrangement with the knowledge that her company did not have title to the Jeep and was not likely to have the means to pay for the Jeep in the future because the business arrangement with Contemporary was ending. She accepted the final accounting between the parties without making any correction to account for her sale of the Jeep. She and Mr. Morrow used the funds prior to Mr. Cochran's discovery of the conversion months later. Between the date of the sale and its discovery, she made no effort to disclose the sale or to pay for the Jeep. Her conversion of the Jeep and the use of the funds created a debt for a willful and malicious injury to the Plaintiff. The Court finds that the debt for the conversion of the proceeds of the sale of the Jeep should be excepted from discharge under section 523(a)(6).

### 3. Amount of Debt

11 U.S.C. § 523 makes any debt for embezzlement or for willful and malicious injury nondischargeable. The Plaintiff requests that the amount of the debt be equal to the cost of the Jeep plus prejudgment interest at the rate of 7% accruing from the date the Jeep was purchased. Although neither party cited any authority for the amount of the award of damages, it appears that the rule is that the damages for conversion are the value of the personalty at the time of conversion plus interest. *Lance Prods., Inc. v. Commerce Union Bank*, 764 S.W. 2d 207, 213 (Tenn. Ct. App. 1988) ("The ordinary measure of damages for conversion is the value of the property converted at the time and place of conversion, with interest." (citing 89 C.J.S, Trover and Conversion §§ 163, 642)).

23

The court finds that Contemporary's assessment of the Jeep's value is supported by the record. On the day the Jeep was sold to Mr. Lorrance it was worth substantially more than Contemporary originally paid for it; however, there was no proof offered as to how much Roller Automotive's refurbishing work enhanced its value. Therefore, the court will use the amount requested by Contemporary, which is the amount that it paid for the Jeep, $16,425, as the measure of its value. It also appears that Contemporary is entitled to 7% interest calculated from the day of conversion, which was April 6, 2013, and continuing until the value of the Jeep has been paid. In addition, the court will allow an additional amount for the interest which accrued under the business arrangement from the period November 28, 2012, to April 5, 2013, as additional actual damages for the losses sustained as a result of the conversion.

### IV.    Conclusion

For the reasons explained above, the court concludes that the debt owed to Contemporary is not dischargeable. It was the result of embezzlement and willful and malicious injury committed by the Debtor as the sole owner of her company. Therefore, the court will grant a judgment in favor of the Plaintiff for $16,425 plus prejudgment interest in the amount of 7% from November 28, 2012.   The court finds that the amount of the judgment is nondischargeable under 11 U.S.C. §§ 523(a)(4) and (6). A separate judgment order will enter.

# # #